UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PATTON BOGGS LLP, 2550 M Street, NW, Washington, DC 20037,<br><br>    Plaintiff,<br><br>      v.<br><br>CHEVRON CORPORATION, 6001 Bollinger Canyon Road, San Ramon, CA 94583,<br>             and<br><br>GIBSON DUNN & CRUTCHER LLP, 333 South Grand Avenue, Los Angeles, California 90071,<br><br>    Defendants. | CIVIL ACTION NO.<br><br><br>COMPLAINT |

Patton Boggs LLP ("Patton Boggs" or "Plaintiff"), as and for its Complaint against the Defendants herein, states as follows:

## PRELIMINARY STATEMENT

1.    This case arises out of an environmental and human rights action against Defendant Chevron Corporation ("Chevron"), which was originally filed in the United States on behalf of Ecuadorian citizens injured by the contamination resulting from Chevron's historic oil extraction operations in that country. After nine years of litigation and two appeals, Chevron succeeded in obtaining a dismissal of the action. This dismissal was based on the company's promise that it would not challenge the jurisdiction of the Ecuadorian courts upon the re-filing of the case in Ecuador and that it would commit to satisfying any judgment issued by the Ecuadorian court subject to the limited right to challenge in an enforcement proceeding under

New York's Civil Practice Law and Rules.[1]   In 2003, an action was filed in Lago Agrio, Ecuador (the "Lago Agrio Litigation") against Chevron on behalf of a group of plaintiffs from the Ecuadorian Amazon (the "Ecuadorian Plaintiffs").[2]   On February 14, 2011, Judge Nicolas Zambrano Lozada, Presiding Judge of the Ecuadorian Court, issued a thorough 188-page Judgment holding Chevron liable (the "Judgment").  The Judgment is on appeal in Ecuador as of the filing of this Complaint.

     2.     In December 2009, Chevron, through its counsel at the Defendant firm Gibson, Dunn & Crutcher LLP ("Gibson Dunn") (collectively "Defendants"), began instituting proceedings in multiple district courts throughout the United States pursuant to 28 U.S.C. § 1782 ("§ 1782 proceedings"), seeking discovery purportedly in aid of its defense of the Lago Agrio Litigation and in aid of a private international arbitration between Chevron and the Government of Ecuador, in which Chevron, among other relief, is asking the panel of three private individuals

---

[1] Of course, Chevron has reneged on its promise to challenge enforcement on this limited basis. Chevron has commenced a Bilateral Investment Treaty arbitration seeking to shut down the Ecuador litigation. Most recently, Chevron has sought and obtained from a U.S. court a temporary restraining order and preliminary injunction preventing enforcement of the Judgment.

[2] The Ecuadorian Plaintiffs include: Daniel Carlos Lusitand Yaiguaje, Venancio Freddy Chimbo Grefa, Miguel Mario Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Simon Luistande Yaiguaje, Armando Wilmer Piaguaje Payaguaje, Javier Piaguaje Payaguaje, Fermin Piaguaje, Luis Agustin Payaguaje Piaguaje, Emilio Martin Lusitande Yaguaje, Reinaldo Lusitande Yaiguaje, Maria Victoria Aguinda Salazar, Carlos Grega Huatatoca, Cataline Antonia, Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Clide Ramiro Aguinda Aguinda, Luis Armandao Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Angel Amanta Milan, Franciso Matias Alvarado Yumbo, Olga Gloria Grefa Cerda, Narcisa Tanguila Narvaez, Bertha Yumbo Tanguila, Lucrecia Tanguila Grefa, Francisco Victor Tanguila Grefa, Rosa Teresa Chimbo Tanguila, Maria Clelia Reascos Revelo, Heliodoro Pataron Guaraca, Maria Viveros Cusangua, Lorenzo Jose Alvarado Yumbo, Franciso Alvarado Yumbo, Jose Gabriel Revelo Llore, Luisa Delia Tanguila Narváez, Jose Miguel Ipiales Chicaiza, Hugo Gerardo Camacho Naranjo, Maria Magdalena Rodríguez, Elias Payahuaje Payahuaje, Lourdes Beatriz Chimbo Tanguila, Octavio Cordova Huanta, Celia Irene Vivero Cusangua, Guillermo Payaguaje Lucitande, Alfredo Payaguaje, and Delfin Payaguaje.

to order the Ecuadorian government to shut down the Lago Agrio Litigation.  As one district court recently noted, Chevron's § 1782 proceedings have "quickly spiral[ed] out of control." *Chevron Corporation v. Mark Quarles*, No. 3:10-cv-00686, Dkt. 108, at 2-3 (M.D. Tenn.).  In an invocation of this limited discovery tool unprecedented in its magnitude, Chevron has to date filed actions in sixteen (16) jurisdictions, sought discovery from at least thirty (30) separate individuals or entities affiliated with the Ecuadoran Plaintiffs, obtained over 275,000 pages of document discovery, and taken eleven (11) depositions.  One witness in these proceedings, one of the Ecuadorian Plaintiffs' counsel, has now sat for 14 (fourteen) days of deposition.

3.      In 2010, Patton Boggs agreed to represent the Ecuadorian Plaintiffs and to assist them in, among other things, opposing Chevron's abuse of the § 1782 mechanism as a means to deplete the Ecuadorian Plaintiffs' limited resources and ostensibly to litigate a foreign case in the American courts.

4.      Defendants have now embarked on a campaign to threaten Patton Boggs through unlawful tactics designed to intimidate Patton Boggs attorneys and to impede Patton Boggs' ability to abide by the contractual and ethical duty of representation that Patton Boggs owes to the Ecuadorian Plaintiffs.  Defendants have also taken steps to prevent Patton Boggs from obtaining payment for its services on behalf of the Ecuadorian Plaintiffs.

5.      Chevron's playbook has long been transparent – for seventeen (17) years, the company has done everything it can to avoid engaging on the merits, to obstruct the progress of the case, and to deprive the Ecuadorian Plaintiffs of legal representation and aid.  Chevron now attempts to paralyze the Ecuadorian Plaintiffs' counsel with unmeritorious threats of disqualification, sanctions, restraining orders and other mechanisms described more fully below.

This is simply the latest move in Chevron's ongoing campaign to ward off anyone who dares to provide aid to the Ecuadorian Plaintiffs.

6.     Notwithstanding the lack of basis underlying Chevron's threats, it has become quite clear that the company will not be content until there remains no attorney left in this country who will dare provide representation to the Ecuadorian Plaintiffs, lest their good name be dragged through the mud.  Trying to prevent the Ecuadorian Plaintiffs from obtaining representation through interference, intimidation and threats is not an acceptable way to defend a case – this abuse must end.

7.     Patton Boggs therefore brings this civil action in part under the Declaratory Judgment Act, 28 U.S.C. § 2201, seeking a declaratory judgment as to whether Patton Boggs should be disqualified from representing the Ecuadorian Plaintiffs simply by virtue of its acquisition of the lobbying firm the Breaux Lott Leadership Group LLC that previously provided pure lobbying services, without more, to Chevron, notwithstanding the fact that the Breaux Lott Leadership Group's lobbying work is not governed by the conflicts provisions of the Rules of Professional Conduct or any other applicable set of rules.

8.     Patton Boggs also seeks damages and injunctive relief for Defendants' tortious interference with Patton Boggs' contractual relationship with its clients.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332.  At all relevant times, the parties were of diverse citizenship, and the amount in controversy is in excess of $75,000.

10.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Patton Boggs has its principal place of business in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

11.    Plaintiff Patton Boggs is a limited liability partnership with its principal place of business in the District of Columbia.  None of its partners reside in Delaware or California.

12.    Defendant Chevron is a Delaware corporation with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, CA 94583.

13.    Defendant Gibson Dunn is a limited liability partnership with its principal place of business at 333 South Grand Avenue, Los Angeles, CA 90071-3197.

## FACTUAL BACKGROUND

The Lago Agrio Litigation

14.    From 1964 to 1992, Texaco, Inc., subsequently acquired by Chevron, owned an interest in an approximately 1,500 square-mile concession in the Ecuadorian Amazon Basin that contained numerous oil fields and more than 350 well sites.   From 1964 until at least 1990, Chevron's predecessor engineered and presided over what some experts believe is one of the worst oil-related environmental disasters the world has ever known, perhaps even larger in scope and impact than the Deepwater Horizon/BP Oil Spill.  It deliberately dumped many billions of gallons of waste byproduct from oil drilling directly into the rivers and streams of the rainforest covering an area roughly the size of Rhode Island.

15.    In 1993, the Amazon communities filed a federal class-action lawsuit against Chevron's predecessor, Texaco, in the United States District Court for the Southern District of New York, seeking "money damages under theories of negligence, public and private nuisance,

strict liability, medical monitoring, trespass, civil conspiracy, and violations of the Alien Tort Claims Act," as well as "extensive equitable relief to redress contamination of the water supplies and environment." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002).

16.     From the lawsuit's inception, Chevron fought vigorously to re-venue the case from the Southern District of New York to the courts of Ecuador, touting the virtues of the Ecuadorian justice system and committing to satisfy any judgment issued by the Ecuadorian court subject to the limited right to challenge in an enforcement proceeding under New York's Civil Practice Law Rules.  The Court of Appeals for the Second Circuit ultimately agreed and dismissed the case on the condition that, when re-filed in Ecuador, Chevron would not challenge the jurisdiction of the Ecuadorian courts.

17.     After final dismissal of the *Aguinda* action in 2002, the Ecuadorian Plaintiffs re-filed the case in Lago Agrio, Ecuador, and trial began in 2003.  The case has been hotly contested and vigorously defended by Chevron.  Indeed, in May 2009, Chevron spokesman Donald Campbell articulated the company's litigation strategy: "We're going to fight this until hell freezes over.  And then we'll fight it out on the ice."  The case has now been litigated in Ecuador for approximately eight years, resulting in the February 14, 2011 Judgment which is now on appeal in Ecuador.

Defendants' Gamesmanship

18.     The Lago Agrio Litigation has been marred by Chevron's dubious litigation tactics designed to obstruct the progression of the case.  For example, two of Chevron's attorneys in Ecuador were recently sanctioned for bombarding the court with frivolous and duplicative motions – on one occasion, Chevron filed nineteen motions in thirty minutes – an attempt to exploit an Ecuadorian rule that requires judges to accept all motions into the proceeding within a

certain, short time period or face recusal. The judge was ultimately recused as a result of this tactic.

19.     Chevron has also allegedly harassed and threatened judicial site inspection experts in the Lago Agrio trial and attempted to obstruct their field sampling by creating false security threats.

20.     Due to threats from Chevron's affiliates in Ecuador, the Inter-American Court of Human Rights recently ordered the Government of Ecuador to provide the Ecuadorian Plaintiffs' legal team in Ecuador with bodyguards.   Not surprisingly, Defendants' attempts to delay, obstruct, and intimidate are not confined to Ecuador – they have now carried over to the United States.

21.     Notwithstanding the fact that Chevron fought desperately for years to move the case to Ecuador, since December 2009, Chevron has filed twenty (20) separate § 1782 proceedings, in sixteen (16) different United States District Courts throughout the country, against the Ecuadorian Plaintiffs' current and former counsel, consulting experts, and their sub-consultants.

22.     Defendants have targeted with § 1782 subpoenas no less than thirty (30) separate persons or entities affiliated with the Ecuadorian Plaintiffs

23.     Upon information and belief, upon determining who will serve as the Ecuadorian Plaintiffs' local counsel in particular § 1782 United States jurisdictions, Chevron or its agents have contacted those attorneys and attempted to intimidate them into withdrawing their representation.

24.     At depositions of the Ecuadorian Plaintiffs' consultants, Gibson Dunn's attorneys have attempted to intimidate the witnesses by asking, at the start of the deposition, whether these

environmental consultants are familiar with various criminal statutes. The District of Colorado ordered Gibson Dunn to stop this abusive practice.  But this has not stopped Defendants from resorting to these tactics elsewhere.

25.     Before entry of the Judgment in Ecuador, Defendants submitted papers to the Ecuadorian court, threatening the *judge* with the possibility of criminal sanctions if the judge does not terminate the Lago Agrio Litigation.

26.     Defendants also recently initiated a § 1782 proceeding designed to cripple the lead United States counsel for the Ecuadorian Plaintiffs at the most critical time in the case by burying him beneath a mountain of discovery requests including no less than sixty-eight document requests; occupying his time with preparing for and sitting for fourteen (14) days of deposition; and attempting to paralyze him with threats of criminal prosecution and other disciplinary action. As part of their improperly broad discovery of this counsel, Chevron, through its attorneys at Gibson Dunn, repeatedly attempts to intrude upon the joint-defense, work-product and other privileges that this counsel enjoys in many of its prior and ongoing interactions with Patton Boggs.  These tactics are notable here as just one part of Defendants' pattern of activity designed to stymie Patton Boggs' ability to effectively represent the Ecuadorian Plaintiffs.

<u>Defendants' Unlawful Interference With Patton Boggs' Contract With Its Clients</u>

27.     Chevron now threatens Patton Boggs, an international law firm with the capability of allowing the Ecuadorian Plaintiffs' to vigorously protect their interests against Chevron's army of lawyers.  Indeed, prior to Patton Boggs' appearance in the case, the firm received a warning communicated through the media – from the American Lawyer on November 8, 2010: "More immediately, will the embarrassment be too great for the Am Law 100 firm that plaintiffs have said is on the verge of joining their team?  '*Anyone jumping into bed with plaintiffs at this*

*point needs to understand what they're signing on to,*' Chevron spokesman Kent Robertson said. '*They will be funding a fraudulent lawsuit.*'" (emphasis added).

28.     Chevron made clear that both Chevron and Gibson Dunn would pull no punches when it came to defending the Lago Agrio Litigation.  As discussed above, Chevron has vowed to litigate this case "until hell freezes over" and beyond.  But what Chevron's threats and boasting failed to reveal was that Chevron was prepared to green-light unlawful defense strategies that would seek to avoid the merits of this litigation in favor of scurrilous attacks on the conduct of the Ecuadorian Plaintiffs' counsel and other attempts to interfere with the Ecuadorian Plaintiffs' counsel's ability to represent their clients.

29.     Patton Boggs was retained by the Ecuadorian Plaintiffs to help obtain a judgment before the Ecuadorian courts that would command international respect, and to enforce that judgment if so rendered.  In return, the Ecuadorian Plaintiffs contractually agreed to compensate Patton Boggs for its services.  Since being retained, Patton Boggs has largely performed its contractual services to the Ecuadorian Plaintiffs out of its New Jersey office, where most of its lawyers working on the engagement are located.

30.     On November 11, 2010, Patton Boggs entered its first appearance on behalf of the Ecuadorian Plaintiffs in the Second Circuit Court of Appeals in *In re Chevron Corporation*, No. 10-4341 CV.  Almost immediately, Defendants Chevron and Gibson Dunn embarked on a campaign designed to impede Patton Boggs' ability to represent its clients through, among other improper strategies, attempts to damage Patton Boggs' professional reputation.

31.     With these unlawful tactics, Defendants' goal is to put pressure on Patton Boggs and make Patton Boggs' performance under its engagement by the Ecuadorian Plaintiffs so onerous that Patton Boggs will withdraw its representation of the Ecuadorian Plaintiffs.

32.     Upon information and belief, Defendant Gibson Dunn is attempting to establish a litigation sub-specialty within their firm that will focus on ferreting out purported fraud in international cases, a so-called "Transnational Litigation and Foreign Judgments" practice group. However, in their zeal to score a high profile victory for their fledgling practice group, they are overstepping the bounds of proper and lawful advocacy.

33.     Within two days of Patton Boggs' November 11, 2010 entry of appearance, by letter dated November 13, 2010, Chevron threatened Patton Boggs' partner James E. Tyrrell, Jr. that it may move to disqualify him and the Patton Boggs firm from representing the Ecuadorian Plaintiffs because of the pure lobbying work that the Breaux Lott Leadership Group LLC performed for Chevron before it was acquired by Patton Boggs.

34.     Currently, Patton Boggs is adverse to Chevron in one of the pending § 1782 proceedings venued in this District.  Thus, there is an actual case and controversy regarding whether or not a conflict of interest exists from Patton Boggs' representation of the Ecuadorian Plaintiffs, such that this Court may declare the rights and other legal relations of the parties with respect thereto.

35.     On December 9, 2010, Gibson Dunn attorney Randy Mastro furthered Defendants' plan to pressure Patton Boggs into abandoning its clients, when, at oral argument before the United States Court of Appeals for the Second Circuit, he accused Patton Boggs of, "for months trying to plot how to enforce a fraudulently obtained judgment in Ecuador."

36.     In prior proceedings in the District of Columbia, Chevron further stated that Patton Boggs (1) "sought a broad waiver from Chevron under false pretenses"; (2) is "[indifferent] to the ethical obligations of its attorneys; (3) was "secretly engineering an 'intentional delay' strategy . . . to prevent Chevron from obtaining the discovery that has exposed

the plaintiffs' fraud, while at the same time pushing for a fast multibillion-dollar judgment procured by fraud in Ecuador" and was proposing "delay and obstruct strategies;" (4) is engaged in "obstructionist, bad faith tactics."

37.    None of the purported facts set forth in the previous paragraph were accurate, and were asserted by Defendants for the sole purpose of damaging the reputation of Patton Boggs, its attorneys, and to pressure Patton Boggs to withdraw from its representation of the Ecuadorian Plaintiffs.

38.    As noted above, Chevron, through its counsel Gibson Dunn, has initiated twenty (20) § 1782 proceedings in sixteen (16) different courts throughout the United States (invariably, these actions are brought on an *ex parte* Order to Show Cause ("OTSC") seeking egregiously short deadlines). Defendants have wrongfully attempted to capitalize on the confusion generated by so many duplicate and geographically disparate filings to further their scheme to interfere with Patton Boggs' ability to represent its clients.

39.    For example, in attempting to argue that a prior  declaratory judgment action in this Court was not ripe, Defendants represented to this Court that "Chevron has never sought Patton Boggs' disqualification." But—that same day—Defendants submitted papers to the United States District Court for the Southern District of New York in which they sought to disqualify Patton Boggs from representing Plaintiffs in the § 1782 proceeding before that court.

40.    Defendants have also repeatedly published statements relating to an e-mail communication from Patton Boggs attorney Eric Westenberger to Ecuadorian Plaintiffs' counsel Steven Donziger regarding a proposed appellate strategy. The strategy in this e-mail was being discussed in connection with a § 1782 proceeding pending in the District of Colorado and Defendants—before this Court and elsewhere—intentionally omitted the following pertinent

facts regarding that e-mail: (1) the purportedly vexatious appellate strategy discussed in this particular e-mail was never implemented; and (2) the portion of this strategy that was implemented—Plaintiffs' motion for clarification—was granted by the court and Defendants never sought any relief from that ruling.  These details and others are intentionally omitted to further Defendants' attempts to fabricate damaging statements about Patton Boggs and its representation of the Ecuadorian Plaintiffs.

41.     On January 7, 2011, Chevron filed an *ex parte* Application for an OTSC against Patton Boggs and other law firms before United States District Judge Lewis Kaplan in the Southern District of New York ("S.D.N.Y.").  Among other things, the OTSC sought to "sanction" Patton Boggs for "purporting to represent the 'Ecuadorian Plaintiffs'."  Defendants filed this application knowing full well that Patton Boggs had never even appeared in that proceeding.  Defendants' goal was to malign and harass Patton Boggs and to interfere with Patton Boggs' relationship with its clients.

42.     In that application, Defendants published untrue and damaging statements regarding Patton Boggs attorneys and Patton Boggs' representation of the Ecuadorian Plaintiffs, stating that Patton Boggs "engaged in a deliberate and concerted campaign of delay and obstruction in U.S. discovery proceedings to avoid disclosing the damning truth."  Because Patton Boggs was not a party to the § 1782 proceeding before the Southern District of New York and had never appeared on behalf of any Lago Agrio Plaintiff before that Court, there can have been no reason to include Patton Boggs in the OTSC application apart from a desire to seize yet another opportunity to publish inflammatory and false statements regarding Patton Boggs and its professionals.

43.    In their Reply papers in support of their application for the OTSC, the Defendants again published false and damaging statements regarding Patton Boggs, going so far as to state that Patton Boggs has become a "key player[] in [a] scheme to obtain a corrupt, multi-billion-dollar judgment against Chevron in Ecuador."

44.    Defendants further abused the OTSC procedure by filing their application *ex parte*, despite having full knowledge of each of the law firms against which they sought relief. Their purpose in doing so was ensure that Patton Boggs would not have adequate time to respond to the scurrilous and false statements contained in this submission.

45.    On January 18, 2011, Defendants submitted a letter to Patton Boggs, equating Patton Boggs' work in assisting the Ecuadorian Plaintiffs in the submission of additional expert reports with engaging in a "scheme" to "whitewash" purportedly fraudulent conduct and stating that Patton Boggs was in violation of the rules of professional conduct.  These accusations are baseless and yet another attempt to interfere with Patton Boggs' duty of representation -- a duty Patton Boggs owes its clients both contractually and ethically.

46.    On February 1, 2011, Defendants filed a complaint in the Southern District of New York, naming Patton Boggs as a "non-party co-conspirator" in a civil RICO lawsuit. Perhaps hoping that, named as a "non-party", Patton Boggs will be unable to defend itself in this lawsuit, Defendants continued their smear campaign, accusing Patton Boggs of being "instrumental in [a] cover-up and obstruction of Chevron's U.S. proceedings."  In this lawsuit, Patton Boggs, a "non-party", also stands accused of bringing "pervasive fraud into the courts of this country and [attempting] to hide their criminal scheme from Chevron and the courts." Certain Patton Boggs professionals are also smeared with allegations of participating in "selected violations" of statutes prohibiting mail and wire fraud.  Defendants fabricate such allegations by

mischaracterizing bits and pieces of e-mails. The unlawful goal of such attacks is to intimidate Patton Boggs and those individual attorneys at Patton Boggs who would represent those injured by Chevron's toxic petroleum dumping in the Amazon.

47.    Defendants' civil RICO pleading is also noteworthy for the fact that it casts aspersion on the actions of virtually every lawyer, scientific consultant, press spokesperson and others working on the Ecuadorian Plaintiffs' behalf, while, for the most part, consciously failing to differentiate between them. Patton Boggs does not give credence to any of the allegations in the civil RICO complaint. Nevertheless, the end-result of Defendants' intentionally deceptive pleading style is that Patton Boggs now stands accused of actions that Defendants know Patton Boggs cannot have engaged in. To wit, Defendants are aware that Patton Boggs was not retained in the Lago Agrio Litigation until 2010. Yet, out of the 150 allegations directed to the indistinguishable group of purported "co-conspirators," at least ninety (90) of those allegations concern supposed activities that occurred in 2009 or earlier. There can be no good-faith reason for pleading in this manner—apart from Defendants' continued strategy to "tar and feather" anyone who would represent the Ecuadorian Plaintiffs.

48.    The same day that it filed its civil RICO action, Chevron issued a press release related to the action, in which it sought to further its scheme with Gibson Dunn by once again publishing baseless accusations against Patton Boggs in a public forum. R. Hewitt Pate, Chevron's vice president and general counsel, stated: "The Lago Agrio plaintiffs' lawyers' aim has been to extort a multi-billion dollar payment from Chevron through fabricated evidence and a campaign to incite public outrage. Chevron has no intention of giving these plaintiffs' lawyers the payday they seek. Rather, we intend to see the RICO defendants held accountable for their misconduct," Mr. Pate continued, "[i]t is sad to see American citizens organizing a shakedown

of a U.S. company while pretending to be helping Ecuadorians and the environment. Equally sad is the pattern of fraud and obstruction in multiple U.S. federal courts in a vain attempt to try to keep the truth from coming out. But now, the truth has been revealed." Chevron and Gibson Dunn know that repetition will not render true their concocted story of fraudulent conduct by Patton Boggs—their hope is that Patton Boggs will simply grow tired of Defendants' constant attacks on its professional reputation and be forced to breach its contract to represent the Ecuadorian Plaintiffs.

49.     In the RICO Complaint, Defendants claim that Ecuador's judiciary is weak and corrupt, and that the Ecuadorian Plaintiffs "and their co-conspirators" have exploited that by "threatening violence, bullying judges, and using political connections to obtain rulings in their favor." While Defendants offer no proof that such conduct occurred (their RICO complaint goes only so far as to offer a purported quote from one of Ecuadorian Plaintiffs' counsel requesting that "a detailed plan" be prepared), there can be no doubt that such tactics are the order of the day for Chevron and Gibson Dunn. Defendants have recently submitted materials to the Ecuadaorian court, threatening the judge with criminal sanctions if he does not grant their motion to terminate the Lago Agrio Litigation.

50.     In the RICO Complaint, Chevron sought, by OTSC, the issuance of a Temporary Restraining Order, enjoining "Defendants and any persons acting in concert with them from funding, commencing, prosecuting, advancing in any way, or receiving benefit from, directly or indirectly, any action or proceeding for recognition or enforcement of any judgment entered against Chevron" in the Ecuadorian litigation. Such tactics are merely the latest volley in Defendants near constant efforts to thwart Patton Boggs' ability to represent its clients.

51.     The Order to Show Cause was entered by a Judge in the Southern District of New York on February 3, 2011.  A temporary restraining order was entered on February 7, 2011 and a preliminary injunction was entered on March 7, 2011.

52.     Not content to bully Patton Boggs' attorneys and seeking to sully Patton Boggs' reputation, Chevron and Gibson Dunn have also thrown all law pertaining to attorney-client privilege to the wind in an attempt to hamper Patton Boggs' ability to represent its clients.  The Southern District of New York has held that, by failing to turn over a privilege log, Ecuadorian Plaintiffs' counsel Mr. Donziger had waived certain privileges.  Nevertheless, in ongoing depositions, Gibson Dunn lawyers have persisted in querying Mr. Donziger about any and all interactions he has with co-counsel—including counsel from Patton Boggs—even ongoing interactions that necessarily occurred long after the date Mr. Donziger supposedly waived any preceding privilege.  Such tactics render it difficult for co-counsel to communicate with one another in confidence, are an unprecedented roadblock to Patton Boggs' duty to zealously represent its clients, and Gibson Dunn knows—or should know—that these tactics are improper.

The Breaux Lott Leadership Group LLC

53.     The Breaux Lott Leadership Group LLC is a lobbying group headed by former Senators Trent Lott and John Breaux and provides lobbying services to clients in Washington, D.C. and throughout the country.  The Breaux Lott Leadership Group LLC is not a law firm and has not provided legal services or advice to its clients.  The Breaux Lott Leadership Group LLC made this fact well known to clients and prospective clients.

54.     Prior to being acquired by Patton Boggs, the Breaux Lott Leadership Group LLC entered into a Lobbying Services Contract with Chevron under which the parties agreed that the

Breaux Lott Leadership Group LLC would provide lobbying and strategic services—not legal services or advice—to Chevron in connection with certain matters.

55.     The Breaux Lott Leadership Group LLC did not agree to, and never did, perform legal work for Chevron.  Instead, by virtue of the agreement between them, the Breaux Lott Leadership Group LLC provided solely non-legal lobbying services to Chevron.

56.     Chevron is well aware of the difference between lobbying services and legal services, as it likely employs hundreds of attorneys just in connection with the Lago Agrio Litigation.

57.     As such, there was never an attorney-client relationship between the lobbying company of Breaux Lott Leadership Group LLC and Chevron, and Chevron cannot state otherwise.

58.     In July 2010, Patton Boggs acquired Breaux Lott Leadership Group LLC to gain its lobbying capabilities.

## COUNT I – DECLARATORY JUDGMENT ACT:
## NO BASIS FOR DISQUALIFICATION

59.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 58 above as if set forth herein at length.

60.     Defendant Chevron has frivolously and baselessly alleged that Patton Boggs' representation of the Ecuadorian Plaintiffs creates a conflict of interest that could result in disqualification of Patton Boggs and has threatened to disqualify Patton Boggs as counsel for the Ecuadorian Plaintiffs based on the Breaux Lott Leadership Group LLC's prior lobbying efforts on behalf of Chevron.  This is a transparent attempt to divert and distract the Ecuadorian Plaintiffs' legal team at a critical juncture in the case.

61.    Under the relevant law, including applicable ethical opinions and the Rules of Professional Conduct, the work performed by the Breaux Lott Leadership Group LLC was limited to mere lobbying services and was not in any way legal in nature, as the Breaux Lott leadership Group LLC was not a company engaged in the provision of legal services or advice. This fact was clearly communicated to Chevron.

62.    The lobbying work performed by the Breaux Lott Leadership Group LLC for Chevron is therefore not governed by the conflicts provisions of the Rules of Professional Conduct.

63.    As such, no conflict of interest can exist by virtue of Patton Boggs' representation of the Ecuadorian Plaintiffs.

64.    Plaintiffs are therefore entitled to a declaratory judgment that there is no basis for disqualification of Patton Boggs from its representation of the Ecuadorian Plaintiffs.

65.    In addition, it would be impracticable for Patton Boggs to resist disqualification in the numerous jurisdictions in which § 1782 proceedings are now pending and any future jurisdictions where Chevron continues to file these proceedings.

## COUNT II – TORTIOUS INTERFERENCE WITH CONTRACT UNDER RESTATEMENT (SECOND) OF TORTS § 766A

66.    Plaintiff repeats and realleges the allegations in paragraphs 1 through 65 above as if set forth herein at length.

67.    Patton Boggs has a contract with the Ecuadorian Plaintiffs for the performance of legal services.

68.    Patton Boggs was retained to help obtain a judgment before the Ecuadorian courts that would command international respect, and to enforce that judgment if so rendered.

69.     Pursuant to Rule 1.3 of the Rules of Professional Conduct of the District of Colombia, Patton Boggs is required "to represent a client zealously and diligently within the bounds of the law."

70.     Patton Boggs' duty to the Ecuadorian Plaintiffs requires it to represent the Ecuadorian Plaintiffs despite opposition, obstruction, or personal inconvenience to the lawyers of Patton Boggs, and to take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor.

71.     Defendants are aware of the attorney-client contract that exists between Patton Boggs and the Ecuadorian Plaintiffs.

72.     The Ecuadorian Plaintiffs—primarily indigenous peoples and other impoverished citizens of Ecuador—do not have the level of sophistication to defend their legal rights against a multi-billion dollar oil corporation and its high-powered international law firm.

73.     The Defendants have engaged in improper offensive tactics aimed forcing Patton Boggs to breach its contract with the Ecuadorian Plaintiffs, with the ultimate aim to deprive the Ecuadorian Plaintiffs of counsel.

74.     Chevron is independently motivated to tortiously interfere with the contract between Patton Boggs and the Ecuadorian Plaintiffs as part of a "win at all cost" strategy to avoid liability for the environmental contamination of the Amazon that it caused.

75.     Gibson Dunn is independently motivated to tortiously interfere with the contract between Patton Boggs and the Ecuadorian Plaintiffs by its direct pecuniary interest in increasing its profits by attorneys' fees owed by Chevron's for engaging in this work and for growing its fledgling Transnational Litigation and Foreign Judgments practice group, which motivation is

separate and distinct from Chevron's interest in ensuring that the Ecuadorian Plaintiffs receive no redress for the injuries Chevron caused them.

76.     As a result of Defendants' actions, Patton Boggs has suffered and continues to suffer irreparable injury.

77.     The actions of Chevron and Gibson Dunn have been undertaken intentionally, with malice, and with knowledge that such actions would likely harm Patton Boggs and its ability to represent the Ecuadorian Plaintiffs in conformance with Patton Boggs' contractual and ethical duties.   Patton Boggs is entitled to damages as well as injunctive relief prohibiting Defendants from further interfering with the attorney-client contract between Patton Boggs and the Ecuadorian Plaintiffs.

## COUNT III – TORTIOUS INTERFERENCE WITH ATTORNEY-CLIENT RELATIONSHIP

78.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 77 above as if set forth herein at length.

79.     Patton Boggs has an attorney-client relationship with the Ecuadorian Plaintiffs.

80.     Patton Boggs, as is required by Rule 1.3 of the Rules of Professional Conduct of the District of Colombia, has been representing the Ecuadorian Plaintiffs zealously and diligently within the bounds of the law.

81.     Defendants are aware of the attorney-client relationship that exists between Patton Boggs and the Ecuadorian Plaintiffs.

82.     Defendants' actions are intentionally designed to damage, and ultimately destroy, the attorney-client relationship that exists between Patton Boggs and the Ecuadorian Plaintiffs.

83.    Upon information and belief, the motive of the Defendants is to injure Patton Boggs and improperly deny the Ecuadorian Plaintiffs their right to counsel.

84.    Chevron is independently motivated to tortiously interfere with the attorney-client relationship between Patton Boggs and the Ecuadorian Plaintiffs as part of a "win at all cost" strategy to avoid liability for the environmental contamination of the Amazon that it caused.

85.    Gibson Dunn is independently motivated to tortiously interfere with the attorney-client relationship between Patton Boggs and the Ecuadorian Plaintiffs by its direct pecuniary interest in increasing its profits by attorneys' fees owed by Chevron for engaging in this work and for growing its fledgling Transnational Litigation and Foreign Judgments practice group, which is separate and distinct from Chevron's interest in crushing the Ecuadorian Plaintiffs' and any chance of obtaining redress in their lawsuit.

86.    As a result of the improper actions of Chevron and Gibson Dunn, the attorney-client relationship between Patton Boggs and Ecuadorian Plaintiffs is suffering irreparable injury.

87.    The actions of Chevron and Gibson Dunn have been undertaken intentionally, with malice, and with knowledge that such actions would likely harm the attorney-client relationship between Patton Boggs and the Ecuadorian Plaintiffs.  Patton Boggs is entitled to injunctive relief prohibiting the Defendants from interfering with the attorney-client relationship between Patton Boggs and the Ecuadorian Plaintiffs.

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT UNDER RESTATEMENT (SECOND) OF TORTS § 766

88.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 87 above as if set forth herein at length.

89.     As stated above, Defendants are aware of the contractual relationship between Patton Boggs and the Ecuadorian Plaintiffs.

90.     Since Patton Boggs' filing on February 7, 2011 of its motion for leave to amend its Complaint, Defendants have engaged in further misconduct by undertaking efforts to cut off the Ecuadorian Plaintiffs' source of funds, causing the Ecuadorian Plaintiffs to breach their contract with Patton Boggs by non-payment of Patton Boggs' legal fees and expenses.

91.     The actions of Chevron and Gibson Dunn have been undertaken intentionally, with malice, and with knowledge that such actions would likely harm Patton Boggs.

92.     As a result of Defendants' actions, Patton Boggs has suffered and will continue to suffer significant injury.   Patton Boggs is entitled to damages for Defendants' tortious interference with the contract between Patton Boggs and the Ecuadorian Plaintiffs.

## COUNT IV – CIVIL CONSPIRACY

93.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 94 above as if set forth herein at length.

94.     On information and belief, Chevron and Gibson Dunn, along with others, have combined, agreed, and conspired to tortiously interfere with Patton Boggs' contract for legal services with the Ecuadorian Plaintiffs, and to ultimately deny the Ecuadorian Plaintiffs their right to counsel.

95.     The conspiring acts render each participant jointly and severally liable for the conspiracy and for all damages ensuing from their wrongdoing.

96.     As a result of the wrongful actions of Defendants and co-conspirators, Patton Boggs has suffered and will continue to suffer irreparable injury.

97.     The actions of Defendants and co-conspirators have been undertaken intentionally, with malice, and with knowledge that such actions would likely harm Patton Boggs and others.

98.     Patton Boggs is entitled to injunctive relief prohibiting Defendants and any co-conspirators from interfering with the attorney-client contract between Patton Boggs and the Ecuadorian Plaintiffs.

**WHEREFORE**, Plaintiff respectfully demands judgment:

A)     Declaring that the Breaux Lott Leadership Group LLC's prior non-legal work for Chevron does not provide a basis for disqualifying Patton Boggs from representing the Ecuadorian Plaintiffs;

B)     For equitable relief as appropriate pursuant to applicable law, including but not limited to injunctive relief barring Defendants or anyone acting in concert with them, from continuing to tortiously interfere with Patton Boggs' contract to represent the Ecuadorian Plaintiffs;

C)     Awarding Patton Boggs damages and all of its costs of suit, including attorneys' fees, to obtain the declaratory and injunctive relief, which was necessitated by Defendants' frivolous allegations and malicious actions; and

D)     Awarding to Patton Boggs such other and further relief as is just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

PATTON BOGGS LLP

By: _____
Charles E. Talisman (D.C. Bar No. 367314)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC  20037
Phone:  (202) 457-6000
Fax:  (202) 457-6315
ctalisman@pattonboggs.com

Dated:  April 27, 2011